**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OPERATING ENGINEERS CONSTRUCTION INDUSTRY MISCELLANEOUS PENSION FUND, individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>              v.<br><br>MGP INGREDIENTS, INC., DAVID COLO, DAVID S. BRATCHER, and BRANDON M. GALL,<br><br>                              Defendants. | Case No.<br><br><br>CLASS ACTION<br><br><br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Operating Engineers Construction Industry Miscellaneous Pension Fund ("Plaintiff"), by and through its undersigned counsel, alleges the following based upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things: (i) a review of Securities and Exchange Commission ("SEC") filings by MGP Ingredients, Inc. ("MGPI" or the "Company"); (ii) a review and analysis of other publicly available information, including press releases issued by MGPI, transcripts of MGPI conference calls, analyst reports on MGPI, and news articles concerning MGPI; and (iii) a review and analysis of other available materials relating to MGPI. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a federal securities class action on behalf of all purchasers of shares of the common stock of MGPI between May 4, 2023 through October 30, 2024, inclusive (the "Class Period"), seeking to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against MGPI, David Colo ("Colo"), David S. Bratcher ("Bratcher"), and Brandon M. Gall ("Gall"), all of whom are collectively referred to as the "Defendants."

2.    MGPI is a company that manufactures, distills, and sells alcoholic beverages such as tequila, bourbon, rye, and other whiskeys, as well as grain-neutral spirits such as vodka and gin.

3.    The COVID-19 pandemic drastically changed the alcohol consumption habits of consumers around the globe. In the United States, studies have shown that there was a considerable uptick in alcohol consumption in 2020, as shown by a significant increase in retail sales. These studies also suggest that during the pandemic, about 25% of people consumed more alcohol than

did prior to the pandemic, and that sales of hard liquor (*i.e.*, spirits), accounted for most of the increase.

4.    MGPI reaped the benefits of this phenomenon, ramping up their production and reporting favorable results earnings call after earnings call.  However, this demand for liquor began to taper in 2023.  While the investing public was aware that an industry-wide destocking in spirits had begun to take place, Defendants assured its skeptical investors that the Company was ahead of the game, having already sold much of, or "cycled through," its inventory.  Defendants also stated that MGPI's exposure to overstocking was smaller than its peers' exposures, and that since the Company's inventory was stable, destocking was "not a core issue," because Defendants had properly monitored and managed the situation.

5.    For example, on February 22, 2024, MGPI provided guidance for fiscal year 2024 with a midpoint that was 4.9% below street consensus.  Additionally, during an earnings call on the same day, Defendant Bratcher confirmed industry reports that "inventory destocking at a wholesale level will remain an issue for the branded spirits industry in 2024."  However, Defendant Bratcher followed this news by stating that MGPI had "work[ed] closely with our distributors throughout 2023" and "made significant progress in managing wholesaler inventory for our portfolio."  In addition, Defendant Bratcher misleadingly claimed that "[h]ealthy demand for our products continue and we believe our business remains well-positioned." He also stated in a press release that "[w]e are very pleased with our performance for the quarter and full year and remain confident in the long-term sustainability of our business model."

6.    Following these statements, MGPI's stock price fell $13.65 per share, or nearly 15%, from a closing price of $91.83 per share on February 21, 2024 to a closing price of $78.14 per share on February 22, 2024, wiping out more than $193 million worth of market capitalization.

Nevertheless, Defendants continued to downplay the situation, and continued promising investors that high inventory levels were of minimal concern.

7.     Then, on October 17, 2024, MGPI admitted that soft demand and high inventories were undermining sales.  Analysts and investors were shocked by Defendants' sudden change of tone.  For instance, on October 18, 2024, Wells Fargo published a report on MGPI, noting that it was lowering its expectations for MGPI's stock price and that the Company had "credibility issues" and would be "putting MGPI in the penalty box . . . ."

8.     A couple of weeks later, shortly after the market opened on October 31, 2024, Defendants then confessed that the excess inventories would have an "even greater impact" on sales in 2025 than previously stated, forcing the Company to scale back certain operations to save money.  Analysts that closely follow the Company were again caught by surprise by these belated admissions, as evidenced by their immediate negative reactions.  For example, an analyst from Lake Street wrote that the stock was "deservedly getting smoked," and that the "market will not give MGPI the benefit of the doubt" going forward.  Additionally, an analyst from Truist Securities stated during the October 31, 2024 earnings call that there had been a "slowdown in the American whiskey consumption now for 12, almost 18 months," but the "surprise factor is that [Defendants are] just realizing it, seeing it now."

9.     As a result of these disclosures, MGPI's share price plummeted almost 50% during the course of two trading weeks.  After the disclosure on October 17, 2024, MGPI's share price declined $24.07 per share, or 29.5%, from a closing price of $81.57 per share to a closing price of $57.50 per share three trading days later on October 22, 2024.  On October 31, 2024, MGPI's share price further declined $8.27 per share, or 14.7%, from a closing price of $56.31 on October

30, 2024 to a closing price of $48.04.  Investors suffered losses of approximately $457 million as a result of these declines.

10.     Throughout the Class Period, Defendants made materially false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants repeatedly touted a strong demand and "normal" inventory levels in brown goods (*i.e.*, American whiskies and tequila), when in fact there had been a slowdown in consumption and oversupply in their products.  Worse, Defendants had assured investors that they were positioned differently than their competitors, and that this was a non-issue, because the Company had already taken steps to mitigate the risk, when in fact it had not.

11.     As a result of Defendants' wrongful acts and omissions, and the sharp decline in the market value of the company's common stock, Plaintiff Operating Engineers Construction Industry Miscellaneous Pension Fund and other class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

12.     The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78y(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) because the Company conducts a substantial amount of business in this District, a significant portion of the damages due to the Defendants' misconduct were suffered within this district, and MGPI common stock trades on the NASDAQ within this District.

14.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and facilities of the national securities markets.

## III.    PARTIES

15.     Plaintiff Operating Engineers Construction Industry Miscellaneous Pension Fund ("Plaintiff") is a multi-employer pension fund that administers benefits on behalf of of construction equipment engineers with hundreds of millions of dollars of assets under management.  During the Class Period, Plaintiff acquired shares of MGPI common stock at artificially inflated prices due to Defendants' false and misleading statements.  When the truth of Defendants' lies became known to the public, the value of Plaintiff's holdings in MGPI significantly decreased in value, and Plaintiff was harmed as a result.

16.     Defendant MGPI is a Kansas company that manufactures alcoholic beverages and food ingredients.  It distills spirits such as bourbon, rye, and other whiskeys (commonly referred to as "brown goods" in its public statements), and grain-neutral spirits such as vodka and gin. MGPI sells its own products under its own brand names as well as to manufacturers of other branded spirits. Founded in 1941, MGPI is headquartered in Atchison, Kansas and its common stock trades on the NASDAQ under the ticker symbol "MGPI."

17.     Defendant Colo was the Company's President and Chief Executive Officer ("CEO") during the Class Period until December 31, 2023, when he was succeeded by Defendant Bratcher.

18.    Defendant Bratcher currently serves as MGPI's President and CEO, as well as a member of the Board of Directors (the "Board").  He was formerly the Company's Chief Operating Officer and President of Branded Spirits prior to assuming the role as President and CEO.

19.    Defendant Gall served, at all relevant times, as MGPI's Chief Financial Officer.

20.    Defendants Colo, Bratcher, and Gall are collectively referred to as the "Individual Defendants."  During the Class Period, the Individual Defendants actively managed the Company, overseeing its operations as well as finances, and made the materially false and misleading statements described below. The Individual Defendants, by virtue of their positions, had extensive knowledge about the core aspects of MGPI's financial and business operations.  They were also deeply involved in deciding which disclosures would be made by the Company to its investors. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts that had not been disclosed to, and were being concealed from the public, and the positive representations which were being made, were materially false and/or misleading at the time they were made.

## IV.    SUBSTANTIVE ALLEGATIONS

21.    MGPI engages in the production and supply of distilled spirits, branded spirits, and food ingredients in the United States and internationally.  The Company operates through three segments: Distillery Solutions; Branded Spirits; and Ingredient Solutions.  The Distillery Solutions segment provides food grade alcohol for beverage applications that include bourbon, rye, and whiskeys, as well as grain neutral spirits, such as vodka and gin, and food-grade industrial alcohol, which is used as an ingredient in food products, personal care products, cleaning solutions, pharmaceuticals, and various other products.  This segment also offers distillery co-products, such as dried distillers' grain, fuel-grade alcohol for blending with gasoline, and corn oil, and provides

6

warehouse services, including barrel put away, barrel storage, and barrel retrieval services, as well as blending services. The Branded Spirits segment provides premium plus, ultra-premium, super premium, premium, mid, and value branded distilled spirits, as well as private label products.

22.    MGPI sells its products directly or through distributors to manufacturers and processors of finished packaged goods, among others. The Company's customers are primarily other businesses, although the Company also sells its products, under its own brands, directly to individuals.

23.    On March 11, 2020 the World Health Organization officially declared the COVID-19 outbreak a global pandemic. This marked the beginning of government-mandated quarantines, lockdowns, and stay-at-home orders. Economic impact payments, or "stimulus checks" were also released to taxpayers to boost their spending power and spur economic activity.

24.    For many individuals, the stress brought about by the pandemic, including stress from social isolation, led to an increase in alcohol consumption. And since restaurants, bars, and other social establishments were closed, people had no choice but to drink within the confines of their homes. Consequently, many individuals increased their liquor purchases for personal consumption.

25.    The liquor industry was quick to notice this trend, as it was supported by precedent. Historically, overall consumption of alcoholic beverages would increase during times of turmoil. The stimulus checks sent to millions of households aided this phenomenon, as cash-rich consumers purchased more liquor for at-home consumption. From 2020 through 2022, the liquor industry overall experienced exceptional growth, led by a high demand in alcoholic beverages. Taking advantage of this opportunity and to meet this demand, companies such as MGPI ramped up their production, eventually leading to favorable results.

7

26.     However, by late 2022 there were indicators that demand was starting to slow down across the liquor industry.  The hard liquor stockpiles were a subject of MGPI's conference calls. For example, on February 23, 2023, Defendant Colo noted as part of his prepared remarks during MGPI's earnings conference call for the fourth fiscal quarter of 2022 that there were "signs of elevated distributor inventory levels" in relation to the Company's premium plus brands.  During the question-and-answer portion of the call, an analyst from Wells Fargo brought to Defendant Colo's attention that the market seemed to be returning to normal, and was asked for his thoughts on the matter:

**Marc Torrente**
Hey, good morning. Thank you for taking my questions. **Just starting high level, we'd love to hear your thoughts on the spirits industry outlook more near-term coming off several years of above average growth. We've heard some narrative of market normalization, even commentary on premiumization slowdown**. So what are you seeing out there in the industry, and maybe if you could offer some refresh perspective on your relative positioning?

**Dave Colo**
Sure, thanks Marc. As you saw in our fourth quarter results, our premium plus brands grew 23% for the quarter. I think in Q2 they grew 12%, Q3 they were up like 16%. So we've continued to see strength in the premium plus portion of our portfolio. I think if you look at some of the data out there, American Whiskey continues to be projected to grow in the 5% to 7% compound annual growth rate. Now that takes into account all price tiers. Our expectation is that premium plus price tier brands will most likely grow above that rate, while obviously mid-value brands are going to grow below that rate. But that's been consistent by the way over the last four to five years that American Whiskey's grown 5% to 7% compound annual growth rate. **We're not seeing presently any indications that that's going to slow down in our Branded Spirits business or in our, our Distilling Solutions segment for that matter.**

**Marc Torrente**
Okay, great. **And then on the distilling side, specifically brown goods; has there been any easing on industry supply constraints with either capacity coming online or demand normalizing?** And what's your outlook for the progress here?

**Dave Colo**
Yes. I think the demand remains strong for both new distillate and aged. Obviously there's been a lot of expansions announced in distilleries, whether they're

distilleries that are owned by some of the multinationals or some of our competitors in the bulk spirit space. **But at this point in time, Marc, we're not seeing any excess capacity on the market.** A lot of that capacity is being added in anticipation of international growth for American Whiskeys. And again, we feel like we're well positioned from a supply point of view in our own business. We announced on this call, we had a 25% improvement in our total output in our Lawrenceburg, Indiana distillery. We previously announced both fermentation and distillation expansions at our Lux Row Distillers and in Bardstown. So we feel well positioned and we think there's going to be adequate demand going forward to support continued growth.

27.    Throughout the Class Period, investors grew increasingly concerned about demand for MGPI's products in light of this the industry-wide liquor oversupply.  Nevertheless, Defendants consistently touted that demand for MGPI's products remained healthy and that inventories were at an appropriate level.  Defendants falsely claimed that they had "worked through the overstock issues" and "rightsized them."  Unbeknownst to investors, while Defendants were speaking positively about the Company's inventory levels and demand for its products, inventories had in fact remained unsustainably high.  Specifically, Defendants had not resolved the issue of oversupply in brown goods that investors had been concerned about.

28.    Defendants' materially false and misleading statements as well as omissions of material facts caused MGPI's stock to trade at artificially inflated prices during the Class Period, which caused investors to pay more for MGPI's stock than it was actually worth.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

29.    Before the markets opened on May 4, 2023, MGPI announced its financial results for its first fiscal quarter for 2023, which beat analyst estimates.  In its Form 8-K filed with the SEC on the same date, Defendant Colo stated that "[s]ales of brown goods grew 10% from the prior year period to record levels, driven by strong new distillate customer commitments, higher pricing across all brown goods, and stronger than expected customer demand for spot purchases. Within our Branded Spirits segment, revenue grew 2% and we recently realigned our national

distribution capabilities with Republic National Distributing Company ("RNDC") toward the end of the quarter. We believe this realignment with RNDC, as well as continued investment in our premium plus family of spirits brands, continues to position us well for incremental growth and margin expansion opportunities going forward."

30.     During the earnings conference call that took place the same day, Defendant Colo highlighted the impressive growth the Company was experiencing:

> Sales of our premium beverage alcohol increased 2%, with continued strength in brown goods sales this quarter, supported by ongoing solid demand for our new distillate and aged whiskey. We remain confident that our significant share, scale advantage and our aging whiskey inventory position, will continue to support the demand within the American whiskey category.

> We're pleased with the improvement in demand visibility and consistency, that we achieved in brown goods as brown good sales growth continues to outpace longer-term market trends, and is primarily driven by craft as well as multinational customers. In an effort to moderate the impact of increased input costs, and excess supply available in the market, for industrial alcohol and white goods, as discussed on our previous call, we reduced the volumes produced and sold of our industrial alcohol and white goods products during the first quarter, to minimize the negative impact on our profitability.

31.     Consistent with the statements above, Defendant Colo reiterated his optimism with regard to demand for the Company's products as part of his concluding remarks:

> Thanks, Brandon. We are pleased with the solid results delivered this quarter, despite increased costs and broader macroeconomic uncertainty. ***Demand for our products in each of our three segments remains strong and we believe our business continues to be well positioned***. We expect to maintain a high level of operational execution and remain deliberate in our actions, as we navigate the market dynamics this year, which is why we are reconfirming our full year fiscal 2023 guidance.

32.     During the question-and-answer portion of the call, Defendant Colo was asked by analysts to elaborate about inventory levels. While recognizing that inventory levels remained high Defendant Colo provided assurances that these would normalize by the end of the year:

**Vivien Azer**

Okay. That's great to hear. And then my follow-up question is on the commentary around inventories. Thank you very much for the incremental color on what it would have looked like or your top line would have looked like ex-Yellowstone. Can you comment at all on kind of more broadly like, what you're hearing from your wholesalers comfort around inventory levels, as we've gone through earnings season, it does seem -- and it's consistent with your script, there's a lot of caution around the US consumer. So I'm just kind of wondering, what wholesaler comfort level is with inventories today, what your comfort level is with your inventories today? Thank you.

**Dave Colo**

Yes. I think in general, I'd say that the distributors may be hearing a little more inventory at this point than normal. However, kind of the other thing that I think, we're anticipating at the distributor level is with interest rates continuing to rise and at the level they are now. It wouldn't surprise us if some of the distributors maybe carried less inventory going forward, because their carrying costs are going to be significantly higher than they were even a year ago. But that's kind of a different issue than the demand side of the equation really to inventory, Vivien. But those are a couple of our observations in the market right now.

**Vivien Azer**

That's a really interesting consideration to call out. Is that factored into your full year guidance?

**Dave Colo**

It is at this point, yes.

**Vivien Azer**

Perfect. Thank you.

*xxx     xxx     xxx*

**Sean McGowan**

Question on inventory, would you expect inventory levels to stay somewhat elevated in relation to sales as the year progresses, or will that be worked down to kind of be more in line with the sales growth at the end of the year?

**Dave Colo**

That's our expectation. Sean, we think that the year presses again particularly in line if you look at the carrying cost in the current interest rate environment we expect that inventory levels will pretty much -- ***shipments should equal to completions is the ideal way the industry runs and we anticipate that as the year plays out that's where the inventories will kind of normalize too***.

11

33.    Equity analysts welcomed these remarks, and over the next several trading days, the stock price went up by approximately 6.3%, from a closing price of $95.42 per share on May 3, 2023, to a closing price of $101.43 per share on May 8, 2023.

34.    However, these statements were false and misleading. Demand for the Company's products did not, in fact, remain strong. Thus, MGPI's inventory levels were unsustainably high, which investors did not know.

35.    Throughout the Class Period, Defendants continued to make similar positive statements about the demand for MGPI's products as well as its inventory levels. For example, on November 2, 2023, MGPI reported its financial results for the third quarter of fiscal year 2023 before the market opened. In its press release accompanying the Form 8-K filed with the SEC on the same date, the Company boasted its sales in brown goods, which, according to Defendant Colo, was "driven by strong demand for our new distillate and aged whiskey."

36.    The Company also held an earnings conference call with investors on November 2, 2023. During the call, Defendant Colo highlighted the growth in sales of brown goods as part of his prepared remarks, even going as far as stating that sales of brown goods for 2024 is mostly locked in:

> Brown goods sales growth has continued to outpace longer term market trends and has been primarily driven by craft, as well as multinational customers. Our confidence in our brown goods sales visibility for the balance of the year remains high.

> Looking ahead to fiscal 2024, our visibility is also improving as we believe we now have the vast majority of our expected Distilling Solutions segment brown goods sales for 2024 already committed.

> We believe we are well positioned to support continued growth in the American whiskey category. We will continue to be strategic with our aged whiskey sales to enable us to meet expected customer needs for the balance of this year, as well as position us to meet anticipated customer needs in the coming years.

37.    With regard to inventory, Defendant Colo stated that they "remain confident that inventory destocking for our brands is close to running its course, and we are focused on driving velocity and points of distribution across our portfolio of brands."

38.    As part of his concluding remarks, Defendant Colo reiterated that "[d]emand for our products in each of the three segments remain strong and we believe our actions will continue to position the business for long-term success." Defendant Colo also announced his retirement and that Defendant Bratcher would be the Company's next President and CEO.

39.    During the question-and-answer portion, Bill Chappell of Truist Securities expressed his concerns about inventory levels, to which Defendant Colo replied that the Company was through with these most of these issues, and what the remaining inventory issues are immaterial:

> **Bill Chappell**
> A couple of questions. I guess, first on the Branded Spirits business, you talked that you were still working through some of kind of the excess inventory within channels and I think the whole industry is. I mean, any way to quantify like what sales could have been or how much that impacted branded sales, because still 6% year-over-year is pretty solid. So just trying to understand or did it really was a very small impact and no impact is expected going forward?
>
> **Dave Colo**
> Yeah. I think, Bill, we discussed this a little bit on the last quarter call, but we feel like we are pretty much through any issues with excess inventory at the distributor level. There may be a few brands that we still have a little bit to work through, but there was really, I don't think our revenue was materially impacted due to any excess inventory issues in the channel.

40.    An analyst from TD Cowen then asked about the volume dynamics between brown goods and white goods, and Defendant Gall reinforced the statements above by stating that demand for the Company's brown goods remained intact:

> **Vivien Azer**
> Hi. Thank you. Good morning and I'd like to echo my congratulations to Dave. My first question is on the Distillery Products segment, another very nice quarter of

price mix realization in premium beverage alcohol, of course, volumes are under pressure. I was wondering whether you could offer some commentary on kind of the volume dynamics between brown goods and white goods in the quarter, please? Thanks.

**Brandon Gall**
Yeah. Vivien, this is Brandon. So, yeah, in our Q, we do break out premium beverage alcohol, which includes both brown goods and white goods, and within that, we share that sales are up 13%, but volume to your point is off 15% and that 15% downdraft is all directly related to white goods and industrial alcohol. So our demand for our brown goods from a volume standpoint remains intact, but I will share the majority of the 28% growth in brown goods in the quarter was price driven.

41.    Defendant Colo then jumped in, stating that "from our perspective, on our inventories, et cetera, what we try to do is balance particularly on our aged side. Our inventory needs and build of inventory with our anticipated future customer needs and demand. And we are still in that position today, we make our laydown decisions based on those anticipated needs and we are not seeing anything today that would tell us that we, as a company, are imbalanced in that particular regard."

42.    However, these statements made in connection with demand and inventory were false and misleading.  Specifically, the Company's issues with excess inventory were far from over, and demand for the Company's products was not strong at all.

## VI.    DEFENDANTS CONTINUE TO MISLEAD INVESTORS AS THE TRUTH BEGINS TO EMERGE

43.    On February 22, 2024, the Company reported its financial results for its fourth quarter for fiscal year 2023 and provided guidance for fiscal year 2024. In its press release accompanying the Form 8-K filed with the SEC on the same date, Defendant Bratcher stated that "[d]emand for our new distillate and aged whiskey was strong, which resulted in brown goods sales increasing 39% and 26% for the fourth quarter and full year 2023, respectively, as compared to the prior year periods."  He further stated that "[w]e are very pleased with our performance for

14

the quarter and full year and remain confident in the long-term sustainability of our business model."

44.     While the Company's results for 2023 beat analysts' expectations, and despite these positive remarks from Bratcher, MGPI's fiscal year 2024 full-year revenue guidance of $749 million at the midpoint came in 4.9% below street consensus.  Furthermore, during the earnings conference call held after the market opened that day, Defendant Bratcher confirmed that recent industry reports indicated "inventory destocking at a wholesale level will remain an issue for the branded spirits industry in 2024."  In an attempt to quell investor fears, he quickly added that the Company had "work[ed] closely with our distributors throughout 2023" and "made significant progress in managing wholesaler inventory for our portfolio."  In addition, Defendant Bratcher mentioned that "[h]ealthy demand for our products continue and we believe our business remains well-positioned."

45.     More importantly, Defendant Bratcher stated that "more than 90% of our new distillate whiskey sales volume is committed in 2024, compared to 50% of our aged whiskey sales volume committed," and that he believed that customer willingness to contract longer-term on new distillate whiskey is a positive sign for the American whiskey category sales.  However, he also noted that "[w]e expect total aged whiskey revenues in 2024 to be less than 2023, due to our strategy of developing longer-term stability with new distillate and because of our success in working with longer-term craft customers, who started their brands with aged whiskey and are now moving into the new distillate market."

46.     During the question-and answer portion of the call, when asked to provide color on product sales and whiskey supply levels as they relate to industry headwinds, Defendants Gall and

Bratcher downplayed investor concerns by saying that everything was under control because they

had prepared for it in 2023:

**Bill Chappell**
Just wanted to go back on the kind of the new distillate sales, and I think one of the things you said was total sales would be down in '24 versus '23. So if you maybe could give some more color, I think you kind of explained what was some customer changes and stuff like that, but try to understand that?

And then also, you had mentioned that you're monitoring the overall American whiskey supply levels, and that might be a headwind. So kind of maybe help us understand that? Are you talking about at retail or are you talking about supply of other players coming for new distillate?

**Brandon Gall**
Yeah, Bill. I'll start on that. Yeah, thanks for giving us the opportunity to clarify. **So we do not expect new distillate sales to decline year-over-year. In fact, we expect brown goods sales in total to continue to grow in line with or better than the broader category of American whiskey in 2024. What we're trying to get across in our prepared remarks is that the proportion of new distillate sales versus aged sales has been growing.** And that has been deliberate as David mentioned on the call. And the reason for that is as our customers that traditionally bought aged, as they continue to mature and grow, they're now better able to finance new distillate.

And so we're leaning into that because there's a lot of attributes of new distillate customers that we find attractive, such as the greater visibility they provide and the greater cash flow characteristics of sliding (ph) distillate versus aged brings. As far as moderating the overall supply to the industry, that's not our plan. We're continuing to grow with our portfolio and with our customers. And as such, the mix may change more towards new versus aged, but we continue to grow at the same pace or better than the American whiskey category as we've done in recent years.

**David Bratcher**
Yeah. I'll add to that too, just in clarification. The new distillate focus is really critical for our business. It gives us longer-term arrangements, financial stability, and visibility for multi-years on average. It's a better business for us in terms of understanding the impact financially on the overall business. It also is somewhat a normal cycle, as the category continues to grow and some of our previous craft customers become bigger, they're naturally going to switch over to new distillate supply, that's just normal. There is no -- we have no plans to moderate our supply to it.

As a matter of fact, we've taken just the opposite approach, as you heard in our call (ph) script, that we're expanding one of our major distilleries in Kentucky, basically

16

doubling its capacity and we expect it to come online mid-year. So we're very optimistic about Branded sales and a plan to expand and continue to grow with the segment.

**Bill Chappell**

Got it. Now that helps. And then if I'm looking at the, just the aged demand, I understand that you're naturally kind of leaning into the new, but are you hearing from your customers, now you have 800 customers, any worries that there's going to be a slowdown in brown good demand three, four years out from now, or is kind of the overall interest pretty much the same as it has been the past few years?

**David Bratcher**

I think what we could say on that is that if we look at our aged distillate and when you referenced about 50% of it being obligated, that's actually pretty high number on aged because most of these tend to be craft customers or new entrants into the category. So actually we feel pretty good about the amount that we have contracted and how that relates to any potential unknown is, is that, those the craft -- the craft distilleries or craft brand companies are subject to the same inventory, retail, wholesale level type of inventory situations as anybody.

And so with higher interest rates and everything else, they're being a little more cautious with their investment. In the past, we've saw them buy just so they could corner their piece of the business. Now you're starting to see them switch to more just-in-time type of demand. They want to transact, know they can fill the product and get it right through the shelf, given the high interest rates that they operate in.

**Bill Chappell**

Got it. And last question, just on the aged, sorry, on the Branded portfolio, your comments about there's still some destocking at distributors and stuff like that, does that mean, I thought most of the impact you kind of saw in the first half of last year, do you expect a quarter where we could be flat to down for that overall business, excluding Penelope or is most of the heavy destocking done?

**David Bratcher**

The comment in general was about the industry overall. **There is still a push on inventory destocking for the industry overall. As it relates specifically to our business, we've worked really hard in the past year to manage that -- actively manage that with our wholesalers. We believe we have it in a controllable area of data on hand.** At the end of the day, the wholesalers do control the inventory and they place the order and they decide what the number is. **I think our exposure on it for us is smaller than, let's say, our peer set because I think we've done a really good job of managing it in 2023.**

**Bill Chappell**

Great. Thanks so much.

17

47.    On this news, MGPI's stock price fell $13.65 per share, or nearly 15%, from a closing price of $91.83 per share on February 21, 2024 to a closing price of $78.14 per share on February 22, 2024, wiping out more than $193 million worth of market capitalization. Nevertheless, Defendants continued to downplay the situation, and continued promising investors that high inventory levels were of minimal concern.

48.    The statements above were false and misleading because demand for the Company's products had already been declining in addition to an oversupply of alcoholic beverages that was, in fact, unsustainable and uncontrollable (which the Company had failed to prepare for), and the expected decline in whiskey revenues for 2024 was precisely due to these factors.

49.    On May 2, 2024, when discussing soft quarterly results, Defendant Gall echoed Defendant Bratcher's statement from the prior quarter that the Company "continue[s] to monitor the potential impact of inventory levels at distributors overall, American whiskey supply and consumption patterns and inflation," but that MGPI was "uniquely positioned to grow as a company in this dynamic operating environment."  Defendant Bratcher elaborated that inventory had "stabilized" as the Company had "worked really hard with our distributors and understanding the inventory levels and managing [how] to meet customer demand."  He further added that "destocking for us at a distributor level is not a core issue," and the Company had "been able to . . . get that inventory manage[d] to the right level[.]"

50.    On August 1, 2024, MGPI announced quarterly results for the second quarter of 2024, which included a marginal increase in sales of brown goods.  During the earnings call, Defendant Bratcher expressed that he was "proud of our sales team for their nimbleness as they continue to work with our branded customers to help them successfully adapt to the current

consumption and inventory patterns at distributor and retailer levels."  Defendant Bratcher further said that "*[d]istributor inventories for our branded portfolio remain relatively stable, even below historical levels*," which Defendant Gall later repeated, stating that "[d]istributor inventory levels for our brands are in good shape."  Bratcher added that "inventory is exactly where we need," and that the Company "continue[d] to monitor [inventories] on a daily basis."

## VII.    THE TRUTH IS REVEALED

51.    On October 17, 2024, the Company reported its preliminary financial results for the third quarter of fiscal year 2024.  In its press release accompanying the Form 8-K filed with the SEC on the same day, the Company revealed that sales were expected to decline 14% from the prior year's third quarter, and revised its guidance downward.  Confirming for the first time that high inventory levels were a significant problem, Defendant Bratcher explained that "[s]oft alcohol spirits category trends and elevated industry-wide whiskey inventories are putting greater than expected pressure on our brown goods business with a larger impact on our smaller, craft customer base. We expect these industry headwinds to persist at least through the rest of the year and will share details about our 2025 outlook with our fourth quarter 2024 earnings release."

52.    The market reacted negatively as a result of this news, and analysts quickly panned the Company's change of tune.  For example, Lake Street wrote in an October 18, 2024 report that the preliminary release was "breathtaking" and shares were "deservedly getting smoked."  Discussing the decline in brown goods sales, Lake Street explained that "magnitude of this decline was a material surprise given how much visibility we thought existed via the contracted status of this business."  In response, Lake Street labeled MGPI as a "show-me" stock and determined that the "market will not give MGPI the benefit of the doubt."  TD Cowen agreed that the news was "worse than we expected," and Truist wrote that the sudden downturn was "surprising" even

though the market was already "well aware of the supply issues in the industry." Likewise, Wells

Fargo issued a report on MGPI, stating:

> Negative pre-announcement. Post close 10/17, MGPI announced softer Q3 results and cut the FY24 guide (sales -6.5%, EBITDA -10% at mid-point), citing category deceleration and elevated inventories pressuring demand. Even with strong H1 delivery, these overhangs have been a headwind to MGPI shares, and now materializing on a lagged basis vs branded peers. We think the lowered outlook raises credibility concerns, with reduced visibility into Q4/FY25 likely putting MGPI in the penalty box near term.

53.     Consequently, the Company's stock price dropped $24.07 per share, or nearly 30%,

from a closing price of $81.57 per share on October 17, 2024 to a closing price of $57.50 per share

three trading days later, on unusually heavy trading volume.

54.     On October 31, 2024, the Company provided additional details in a press release

accompanying its Form 8-K filed with the SEC on the same date.  Defendant Bratcher once again

pointed to "the softening American whiskey category trends and elevated industry-wide barrel

inventories" as the source of its troubles, prompting the Company to "to further lower our net aging

whiskey put away, scale down our whiskey production, and optimize our cost structure to mitigate

lower production volumes."

55.     During an earnings conference call with investors that the Company held on the

same day shortly after the market opened, Defendant Bratcher finally admitted that "slower growth

and higher inventories are leading to lower demand, lower prices and reduced visibility on our

contract distilling sales."   Defendant Gall likewise added that the Company is "significantly

reducing our brown goods production to better align with demand in 2025. At the same time, softer

American whiskey growth and elevated barrel inventories continue to constrain demand for aged

whiskey and increasingly our new distillate."

56.     During the question-and-answer portion of the conference call, an analyst from

Truist Securities noted that "we've seen a slowdown in American whiskey consumption now for

12, almost 18 months. And so I guess the surprise factor is that you're just realizing it, seeing it now."

57.     Another analyst from Sturdivant expressed his skepticism and surprise that the Individual Defendants "missed" the slowdown, to which he asked Defendant Bratcher to elaborate further:

**Mitch Pinheiro**
Okay. Then getting back to the -- it does surprise me that industry-wide everybody sort of missed the slowdown. I'm curious whether any of that has to do with any on-premise, off-premise trends that may have been missed?

And then the second question is, what also may have been missed, which I've been seeing for a while is, consumer liquor cabinet destocking. Once you can -- once you're able to get your favorite brand back during the COVID error, it was hard to find it. And if you found a bottle or 2, you bought 2 or 3 or 4 bottles because you weren't sure you were ever going to see them again.

And I guess at some point, consumers decided -- they felt more comfortable with starting to see their favorite brands on the shelves and starting to -- instead of buying it, just going through their own cabinet and reducing their own inventory, I guess there's no way -- Have you done any research on that part of the equation as far as the slowdown in consumption is concerned? And just also the comments on the premise versus -- on-premise versus off-premise missing the slowdown here?

**David Bratcher**
Okay. And I'll take that one. So in general, if you think about on-premise versus off-premise, the mix is roughly the same, but the problem post-COVID, there's not as many as on-premises there was. So you're still seeing that being relaunched over time. I'm not going to attribute that mix to the industry's view on why it happened. I tend to take more of a macro view on this. I tend to think that we're in the middle of an election. We've had all kinds of interesting things going on in the environment. Consumer spending is a little bit slower than this.

I think there's a lot of external pressures going on here that is making that consumer make different choices, all right? And so I don't want to speculate on they're selling more there or not selling more there. I'm attributing it to that consumer. I also bring it back to this COVID piece. Having done this for 30 years in the brands, what we're selling back to is about what we should be in the industry. COVID was great for our industry for the period of time.

And now when we all reflect back and we look at these last few years of correction, and it is inventory destocking at a wholesaler, it is inventory destocking in a pantry.

> You've got multitudes of variables coming to a head. Those 2 shall pass. Now what we all are terrible at doing, myself and everybody else in the industry is telling you exactly when that's going to pass. You know why? Because we can't read the consumers' minds. We can only watch what they're doing and react to their needs.

58.    Analysts again reacted negatively to this news, and after these additional disclosures, the price of MGPI stock declined $8.27 per share, or nearly 15%, from a closing price of $56.31 per share on October 30, 2024, to a closing price of $49.04 per share on October 31, 2024.

## VIII.   SCIENTER

59.    Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued or disseminated to the investing public during the Class Period were materially false or misleading.   Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as well as actions intended to manipulate the market price of MGPI common stock, as primary violations of the federal securities laws.   Defendants, by virtue of their receipt of information reflecting the true facts regarding MGPI, their control over, receipt, and/or modification of MGPI's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

60.    Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.   The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.   Given their positions with MGPI, the Individual Defendants controlled the contents of MGPI's public statements during the Class Period.   The Individual Defendants were each provided with, or had access to, the information alleged herein

to be false and misleading prior to, or shortly after its issuance, and had the ability as well as the opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from the public, and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of MGPI's corporate statements, and is, therefore, responsible and liable for the representations contained therein.

## IX.    LOSS CAUSATION/ECONOMIC LOSS

61.    Plaintiff and other class members were damaged as a result of Defendants' fraudulent conduct as alleged herein. During the Class Period, Defendants engaged in a scheme to deceive investors by issuing a series of material misrepresentations and omitting material facts, trends, commitments, and uncertainties required to be disclosed, relating to MGPI's operations, business, financial performance, and future prospects.

62.    As a direct result of Defendants' scheme, misrepresentations of material fact, and omissions of material fact, the price of MGPI's common stock was artificially inflated throughout the Class Period.

63.    Class members unknowingly and in reliance on Defendants' materially false or misleading statements and/or omissions purchased MGPI common stock at artificially inflated prices on the NASDAQ. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Plaintiff and other Class members would not have purchased MGPI common stock at the artificially inflated prices at which it traded during the Class Period.

64.    The truth regarding Defendants' fraud was revealed in corrective disclosures that were made on February 22, 2024, October 17, 2024, and October 31, 2024. In response to these

corrective disclosures, the price of MGPI's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct was removed from MGPI's stock price.

65.     This decline in MGPI's stock price following the corrective disclosure is directly attributable to the market absorbing information that disclosed the falsities in or misleadingly omitted from Defendants' material misrepresentations and omissions.

66.     Plaintiff and other class members suffered economic losses as the price of MGPI's stock fell in response to the corrective disclosures.  It was foreseeable that such disclosures would cause MGPI's stock price to decline.  Thus, the Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiff and other class members.

## X.    PLAINTIFF IS ENTITLED TO A PRESUMPTION OF RELIANCE

67.     At all relevant times, the market for shares of MGPI common stock was an efficient market by virtue of the following reasons, among others: (i) shares of MGPI common stock met the requirements for listing, was actually listed and actively traded on the NASDAQ (ii) according to the Company's Form 10-K filed with the SEC on February 2, 2024, MGPI had 22,065,046 outstanding shares of common stock as of February 16, 2024, demonstrating a broad market for MGPI common stock; (iii) as a registered and regulated issuer of securities, MGPI filed periodic reports with the SEC and NASDAQ, in addition to the Company's frequent voluntary dissemination of information; (iv) MGPI regularly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services, the Internet, and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; (v) MGPI was followed by securities analysts employed by major brokerage firms, who wrote reports that were distributed to the customers of their respective

brokerage firms and made such reports publicly available; (vi) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of MGPI common stock; and (vii) without knowledge of the misrepresented or omitted facts, Plaintiff and the members of the class purchased or otherwise acquired MGPI common stock between the time Defendants made the material misrepresentations and omissions and the time the truth was revealed, during which period the price of MGPI's common stock was artificially inflated as a result thereof.

68.     The market for MGPI common stock promptly digested current information regarding MGPI from all publicly available sources and reflected such information in the price of MGPI common stock. Under these circumstances, all purchasers of MGPI common stock during the Class Period who relied upon the integrity of the market price of MGPI common stock, including Plaintiff, suffered similar injury through their purchase of MGPI common stock at artificially inflated prices, and a presumption of reliance under the fraud-on-the-market doctrine applies.

## XI.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

69.     The Private Securities Litigation Reform Act's statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

70.     None of the statements complained of herein were forward-looking statements. Rather, each was a historical statement or statement of purportedly current facts and conditions at the time each statement was made.

71.     To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by

meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof. As set forth above, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants do not insulate Defendants from liability for their materially false or misleading statements or omissions.

72.    To the extent that the statutory safe harbor applies to any materially false or misleading statement alleged herein, or any portion thereof, Defendants are liable for any such materially false or misleading forward-looking statement because at the time such statement was made the speaker knew the statement was materially false or misleading, or the statement was authorized and approved by an executive officer of MGPI who knew that the forward-looking statement was materially false or misleading.

## XII.   CLASS ACTION ALLEGATIONS

73.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) individually and on behalf of a Class consisting of all persons and entities that purchased or otherwise acquired the publicly traded common stock of MGPI between February 23, 2022 and February 28, 2024.

74.    Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of MGPI, members of MGPI's Board, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; (iv) any entity in which Defendants have or had a controlling interest; and (v) any affiliate of MGPI.

75.    The members of the class are so numerous that joinder of all members is impracticable. Throughout the Class Period, MGPI's securities were actively traded on the

NASDAQ. While the exact number of class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery from Defendants, Plaintiff believes that there are at least hundreds, if not thousands, of members in the proposed class. Class members may be identified from records maintained by MGPI or its transfer agent and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

76.     Plaintiff's claims are typical of all other class members' claims, as all class members are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws complained of herein.

77.     Plaintiff will fairly and adequately protect the interests of the class members and has retained counsel competent and experienced in class and securities litigation.

78.     Common questions of law and fact exist as to all class members and predominate over any questions solely affecting individual class members. Among the questions of law and fact common to the class are: (i) whether Defendants' acts and omissions as alleged herein violated the federal securities laws; (ii) whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts about MGPI's operations, business, performance, and future prospects; (iii) to what extent the class members have sustained damages; and (iv) the proper measure of such damages.

79.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable. Furthermore, as the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impossible for class members to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII.   CAUSES OF ACTION

## COUNT I

### Violation of Section 10(b) of the Exchange Act
### Against All Defendants

80. Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein. This claim is brought against Defendants pursuant to § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

81. During the Class Period, Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange to make materially false or misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including Plaintiff; (ii) cause the market price of MGPI common stock to trade above its true value; and (iii) cause Plaintiff as well as other class members to purchase or otherwise acquire MGPI common stock at artificially inflated prices that did not reflect the stock's true value during the Class Period. In furtherance of their unlawful scheme, plan, or course of conduct, Defendants took the actions alleged herein.

82. While in possession of material adverse non-public information, Defendants, individually and in concert, directly or indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made false or misleading statements of material fact and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for MGPI common stock, in violation of § 10(b) and Rule 10b-5. Defendants are alleged as primary participants in the wrongful conduct alleged herein.

83.     Defendants acted with knowledge or a reckless disregard for the truth of the materially misrepresented and omitted facts alleged herein in that they failed to disclose such facts even though such facts were readily available to them, if not known. Defendants' material misrepresentations and omissions were made knowingly and/or recklessly for the purpose and effect of concealing the truth regarding MGPI's operations, business, performance, and future prospects from the investing public and supporting the artificially inflated price of its common stock.

84.     As set forth above, the dissemination of the materially false or misleading information and failure to disclose material facts artificially inflated or maintain artificial information already in the market price of MGPI common stock during the Class Period. Plaintiff and other class members purchase or otherwise acquired MGPI common stock during the Class Period at artificially inflated prices in direct or indirect reliance on: (i) the materially false or misleading statements made by Defendants; (ii) the efficiency and integrity of the market in which the Company's common stock trades; and (iii) the absence of material adverse information that Defendants knew of or recklessly disregarded but did not publicly disclose. As the previously misrepresented and/or concealed material facts eventually emerged, the price of MGPI common stock substantially declined, causing losses to Plaintiff and other class members.

85.     At the time of the material misrepresentations and omissions alleged herein, Plaintiff and other class members were not aware of their falsity and believed them to be true. Had Plaintiff and other class members known the relevant truth regarding MGPI's financial results, operations, business, and prospects, which was misrepresented and/or concealed by Defendants, Plaintiff and other class members would not have purchased or otherwise acquired MGPI common stock at artificially inflated prices.

86.     By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other class members suffered damages in connection with their transactions in the Company's common stock during the Class Period.

## COUNT II

### Violation of Section 20(A) of The Exchange Act
### Against The Individual Defendants

87.     Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.  This claim is brought against the Individual Defendants pursuant to § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

88.     Prior to and during the Class Period, the Individual Defendants, by virtue of their high-level positions, were privy to, and monitored, confidential and proprietary information concerning MGPI, its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

89.     In their respective roles, the Individual Defendants had regular access to non-public information about MGPI's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other of MGPI's corporate officers and employees, attendance at management meetings and meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

90.     Each of the Individual Defendants was a controlling person of MGPI within the meaning of § 20(a), as alleged herein. By virtue of their high-level positions, their participation in or awareness of the Company's day-to-day operations and finances, and/or knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the

Individual Defendants each had the power and authority to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the statements Plaintiff alleges were materially false and misleading.

91.    Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of MGPI common stock during the Class Period, which included the dissemination of materially false or misleading financial statements and statements (both affirmative statements and statements rendered misleading because of material omissions) set forth above. The scheme: (i) deceived the investing public regarding MGPI's operations and the true value of MGPI's common stock; and (ii) caused Plaintiff and other class members to purchase MGPI common stock at artificially inflated prices, which plummeted in value when the truth concerning MGPI's business, operations, performance, and future prospects was revealed.

92.    The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements Plaintiff alleges were materially misleading prior to and/or shortly after these statements were issued and had the ability and ultimate authority to prevent the issuance of these statements or cause these statements to be corrected. In particular, the Individual Defendants maintained direct and supervisory involvement in the day-to-day operations of the Company and therefore had, or are presumed to have had, the power to control or influence the particular public statements or omissions giving rise to the securities violations as alleged herein and exercised the same.

93.    As set forth above, Defendants violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged herein. By virtue of the Individual Defendants' status as controlling persons and their respective participation in the underlying violations of § 10(b) and Rule 10b-5, the

Individual Defendants are liable under § 20(a). As a direct and proximate result of the Individual Defendants' culpable conduct, Plaintiff and other class members suffered damages in connection with their transactions in MGPI's common stock during the Class Period.

## XIV.    PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment, including:

1.    Certification of this action as a class action;

2.    Awarding compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon, as allowed by law;

3.    Awarding Plaintiff its costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

4.    Awarding such other and further relief as may be just and proper.

## XV.    JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: December 16, 2024                    Respectfully submitted,

**GRANT & EISENHOFER, P.A.**

/s/ Daniel L. Berger
Daniel L. Berger
Caitlin M. Moyna
Timothy Clark B. Dauz
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (610) 722-8501
dberger@gelaw.com
cmoyna@gelaw.com
tdauz@gelaw.com

*Counsel for Operating Engineers*
*Construction Industry Miscellaneous Pension*
*Fund*

**CERTIFICATION OF OPERATING ENGINEERS CONSTRUCTION INDUSTRY AND MISCELLANEOUS PENSION FUND**

I, M. Scott Anderson, on behalf of the Operating Engineers Construction Industry Miscellaneous Pension Fund ("Operating Engineers") certify pursuant to 28 U.S.C. § 1746 and 15 U.S.C. § 78u-4 as follows:

1.      I am Executive Director of Operating Engineers, and I have fully reviewed the Class Action Complaint for Violations of the Federal Securities Laws and authorize its filing. I am duly authorized to make this certification.

2.      Operating Engineers did not purchase or acquire MGP Ingredients, Inc. common stock at the direction of counsel or in order to participate in any private action.

3.      Operating Engineers is willing to serve as a representative party on behalf of the proposed class, including providing testimony at deposition and trial, if necessary.

4.      Attached as Schedule A to this Certification is a list of Operating Engineers' transactions during the period of May 4, 2023 through October 31, 2024, inclusive, in the common stock that is the subject of this matter.

5.      During the three-year period preceding the date of this certification, Operating Engineers has sought to serve as a representative party on behalf of a class asserting claims under the federal securities laws as follows:

        *None*

6.      Operating Engineers will not accept any payment for serving as a representative party on behalf of the proposed class beyond its pro rata share of any recovery, except as ordered or approved by the court.

1

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 16 day of December, 2024.

M. Scott Anderson, Executive Director
*Operating Engineers Construction*
*Industry Miscellaneous Pension Fund*

2

# MGP Ingredients, Inc. -- Schedule A
## Operating Engineers Construction Industry and Miscellaneous Pension Fund

**Cusip:** 55303J106
**Ticker:** MGPI
**Class Period:** May 4, 2023 through October 30, 2024

**Beginning Holdings:** 3,720 shares

| Purchases | | | | Sales | | |
|---|---|---|---|---|---|---|
| Trade Date | Quantity | Price | | Trade Date | Quantity | Price |
| 05/30/23 | 65 | $95.57 | | 10/18/24 | 730 | $64.16 |
| 05/30/23 | 65 | $95.49 | | | | |
| 05/31/23 | 55 | $94.86 | | | | |
| 06/01/23 | 35 | $96.50 | | | | |
| 06/02/23 | 60 | $100.47 | | | | |
| 12/04/23 | 115 | $90.09 | | | | |
| 12/05/23 | 135 | $92.31 | | | | |
| 12/05/23 | 25 | $91.96 | | | | |
| 12/06/23 | 265 | $88.27 | | | | |
| 12/06/23 | 40 | $90.99 | | | | |
| 01/24/24 | 380 | $86.02 | | | | |
| 01/25/24 | 250 | $86.50 | | | | |
| 02/15/24 | 575 | $87.34 | | | | |
| 02/15/24 | 75 | $87.00 | | | | |
| 05/07/24 | 70 | $80.63 | | | | |
| 05/08/24 | 135 | $82.08 | | | | |
| 05/09/24 | 95 | $83.25 | | | | |
| 05/10/24 | 75 | $82.98 | | | | |
| 05/13/24 | 110 | $82.59 | | | | |
| 05/14/24 | 55 | $82.55 | | | | |
| 06/10/24 | 115 | $72.86 | | | | |
| 06/11/24 | 120 | $73.79 | | | | |
| 06/12/24 | 220 | $75.17 | | | | |
| 06/13/24 | 190 | $74.14 | | | | |
| 06/14/24 | 85 | $74.46 | | | | |
| 08/15/24 | 75 | $88.80 | | | | |
| 08/16/24 | 75 | $87.78 | | | | |
| 08/19/24 | 80 | $87.62 | | | | |
| 08/23/24 | 35 | $90.90 | | | | |
| 08/26/24 | 30 | $92.02 | | | | |
| 08/27/24 | 35 | $90.55 | | | | |